### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**AFFORDABLE BIO FEEDSTOCK, INC. and AFFORDABLE BIO FEEDSTOCK OF PORT CHARLOTTE, LLC,**

**Plaintiffs,**

**v.**                                                    **Case No: 6:19-cv-1835-PGB-DCI**

**UNITED STATES OF AMERICA,**

**Defendant.**

_____/

### ORDER

This cause comes before the Court on the following motions and related filings:

1.    Plaintiffs' Motion for Summary Judgment (Doc. 45 ("**Plaintiffs' Motion**)), Defendant's response in opposition (Doc. 48), and Plaintiffs' reply thereto (Doc. 53); and

2.    Defendant's Motion for Summary Judgment (Doc. 42 ("**Defendant's Motion**)), Plaintiffs' response in opposition (Doc. 47), and Defendant's reply thereto (Doc. 54).

Upon consideration, Plaintiffs' Motion is due to be denied, and Defendant's Motion is due to be granted.

# I.      BACKGROUND

## A.      Relevant Tax Law

26 U.S.C. § 4041(a)(2) imposes an excise tax against those engaged in certain activities involving alternative fuels. Section 4101(a) requires taxpayers to register for this alternative fuel excise tax in accordance with Internal Revenue Service ("**IRS**") regulations.

To register, a taxpayer must submit a Form 637 Application for Registration for Certain Excise Activities ("**Form 637**") to the IRS. Treas. Reg. § 48.4101-1(e); (Doc. 46, ¶ 9). The Form 637 includes a list of "activity letters." (*See* Doc. 45-11). Each activity letter corresponds with a discrete category of conduct regulated by the alternative fuel excise tax. The applicant reports its current or future activities by selecting the pertinent "activity letter" from the list.

Upon receipt of the Form 637, an agent from the IRS's Excise Tax Group performs an Initial Compliance Review ("**ICR**") to determine whether the applicant's delineated current or future activities require (or permit) registration for the alternative fuel excise tax. § 48.4101-1(c)–(e), (f)(2); (Doc. 46, ¶¶ 12–18). If the ICR demonstrates that the applicant qualifies for alternative fuel excise tax registration, then, after review of the agent's recommendation, the Chief of the Excise Tax Group—also known as the District Director—approves the Form 637 and registers the applicant for the specified activity letter. (Doc. 46, ¶¶ 12–22; *see* Docs. 45-8, 45-9).

Registration for the "AL" activity letter is essential to claim the alternative fuel excise tax credit authorized by 26 U.S.C. § 6426(d). (Doc. 45, pp. 7–10, ¶¶ 8–16; Doc. 46, ¶ 13; Doc. 54, p. 5). Section 6426(d) awards this credit to AL activity letter registrants who sell alternative fuel for use as a fuel in a motor vehicle or motorboat. The credit applies only against and to the extent of a registrant's alternative fuel excise tax liability. § 6426(a)(2); (Doc. 45, pp. 8–9, ¶¶ 14–15).[1]

AL activity letter registrants usually claim this generally non-refundable alternative fuel excise tax credit by filing a Form 720 Quarterly Federal Excise Tax Return ("**Form 720**"). (Doc. 45, pp. 6, 9, ¶¶ 6, 14 n. 8; Doc. 46, ¶ 24). However, in the 2015 tax period, the IRS allowed AL activity letter registrants to claim the credit on a Form 8849 Claim for Refund of Excise Taxes ("**Form 8849**"), which usually only applies to § 6427(e). (Doc. 45, pp. 6, 9, ¶¶ 6, 14 n. 8).

Section 6427(e) authorizes an alternative fuel excise tax credit for alternative fuel excise tax registrants—including AL activity letter registrants—who sell or use an alternative fuel in accordance with § 6426(d). This credit is refundable, which

---

[1]  A tax credit reduces a taxpayer's tax liability dollar-for dollar. For example, a $100 credit reduces a taxpayer's tax balance due by $100.

Tax credits are refundable or non-refundable. A refundable credit is subtracted from the amount of taxes owed, and it can reduce a taxpayer's liability to below zero. If the amount of the refundable credit is more than the amount of taxes due, the difference is paid to the taxpayer as a tax refund. By contrast, a non-refundable credit is subtracted from the income tax liability up to the total amount owed—that is, a non-refundable credit cannot reduce the tax balance beyond zero and thus does not offer the advantage of a tax refund to the taxpayer. IRS.COM, https://www.irs.com/articles/refundable-vs-non-refundable-tax-credits (last visited Mar. 10, 2021).

allows one in excess of its alternative fuel excise tax liability to receive a refund. §
6427(e)(2).

If a refund made pursuant to § 6427(e) constitutes an "excessive amount,"
then the IRS can assess and collect that payment as if the claiming entity was liable
for the alternative fuel excise tax. § 6206. An "excessive amount" is the sum by
which the claim exceeds the amount allowable. § 6675(b).

AL activity letter registration is only valid—and, accordingly, the alternative
fuel tax credit, under either § 6426(d) or § 6427(e), is only available—if the Chief
of the Excise Tax Group has issued the registration and has not revoked or
suspended it. Treas. Reg. § 48.4101-1(a)(2). The Chief of the Excise Tax Group
must revoke or suspend the AL activity letter registration if he "determines, at any
time," that: (i) the registrant's alternative fuel activities do not qualify for
registration, and it failed to correct the deficiencies within a reasonable period of
time after notification; (ii) the registrant used the AL activity letter registration to
evade, attempt to evade, postpone, interfere with, or make a fraudulent claim for
credit or payment; (iii) the registrant aided or abetted another in evading,
attempting to evade, postponing, interfering with, or making a fraudulent claim
for credit or payment; or (iv) the registrant sold, leased, or otherwise allowed
another to use its AL activity letter registration. § 48.4101-1(i)(1). "The effective
date of the revocation or suspension may not be earlier than the date on which the
district director notifies the registrant." § 48.4101-1(i)(3).

### B.    Factual and Procedural Background

Plaintiffs Affordable Bio Feedstock, Inc. ("**ABF**"), and Affordable Bio Feedstock of Port Charlotte, LLC ("**ABFPC**"), acquired oil and food waste, or "brown grease," from restaurants and processed it for use as alternative fuel. (Doc. 46, ¶ 4). Plaintiffs' business model contained two operational revenue streams: (1) brown grease haulers paid Plaintiffs to accept the waste, called a "tipping fee"; and (2) Plaintiffs sold the recycled brown grease product to Florida Biodiesel, who, in turn, sold the product primarily to Green Energy Group, a biofuel broker. (*Id.* ¶¶ 4–6).

On May 29, 2013, and June 13, 2013, Plaintiffs submitted their respective Form 637s to the IRS, requesting AL activity letter registrations. (Doc. 42-8; Doc. 42-9; Doc. 45-10; Doc. 45-11; Doc. 46, ¶¶ 11–12, 22). Subsequently, the Excise Tax Group conducted ICRs to determine whether Plaintiffs qualified as taxpayers who sell alternative fuel for use in motor vehicles or motorboats. (Doc. 46, ¶¶ 13–16, 22). Jim Wheatley, an IRS agent with 20 years of experience in the Excise Tax Group, conducted both ICRs and concluded that Plaintiffs' activities qualified them for AL activity letter registration. (*Id.* ¶¶ 17, 19–22). On August 16, 2013, and September 26, 2013, respectively, Darryl Gilliam, the Chief of the Excise Tax Group, sent Plaintiffs signed letters informing them of the approval of their Form 637s' requests for AL activity letter registrations. (Doc. 42-6; Doc. 42-7; Doc. 45-8; Doc. 45-9; Doc. 46, ¶¶ 21–23).

The AL activity letter registrations remained valid[2] until 2016, when Plaintiffs filed separate Form 8849s that claimed refunds in alternative fuel excise tax credits. (Doc. 42-16; Doc. 45-24; Doc. 45-25; Doc. 46, ¶¶ 37–38). Specifically, Plaintiff ABF claimed $423,315 for 2015, and Plaintiff ABFPC claimed $42,112 for January 2016. (Doc. 46, ¶¶ 37–38). The IRS paid ABF's claim on March 22, 2016, and it paid ABFPC's claim on April 19, 2016. (*Id.*). In October 2016, the IRS began auditing Plaintiffs for these claims. (*Id.* ¶¶ 37–38, 40).[3]

On January 25, 2018, Felicia Walker, the Chief of Estate, Gift, and Excise Tax Examination, sent Plaintiffs signed letters revoking their AL activity letter registrations, effective immediately. (Doc. 42-10; Doc. 42-11; Doc. 45-33; Doc. 45-34; Doc. 46, ¶ 44). On September 17, 2018, the IRS sought reimbursement of the paid alternative fuel tax credits as well as payment of interest and certain penalties. (Doc. 42-15; Doc. 42-18; Doc. 45-35; Doc. 45-36; Doc. 46, ¶ 43).

Plaintiffs—who had sold their assets to a third party in October 2017—returned, under protest, a divisible portion of the paid tax credits. (Doc. 46, ¶¶ 42,

---

[2]  On April 7, 2015, the Chief of the Excise Tax Group agreed with agent Allen Brown's conclusion that Plaintiffs satisfied the requirements to receive the alternative fuel excise tax credits claimed for the tax period of June 30, 2013 through September 30, 2013. (Doc. 46, ¶¶ 25–27). On March 4, 2016, the Chief of the Excise Tax Group determined that the Follow-Up Compliance Review and the audit of Plaintiff ABF's claim for alternative fuel tax credits in 2014, performed again by Brown, showed that ABF continued to qualify for the alternative fuel excise tax credit. (*Id.* ¶¶ 28–36). The IRS contends that most of these facts are not material. (*Id.*).

[3]  It is unclear whether the IRS audited Plaintiffs' claims under 26 U.S.C. § 6426(d) or § 6427(e), but Plaintiffs assert that the IRS should have construed their claims under § 6427(e). (Doc. 45, pp. 8–9, ¶¶ 14–15). However, the operative statute is ultimately irrelevant given the parties' stipulation that Plaintiffs' satisfaction of the statutory requirements for the alternative fuel excise credit is not at issue here. (Doc. 30).

45–46). ABF paid, under protest, $3,497.09, and then filed a Form 843 Claim for Refund and Request for Abatement ("**Form 843**") for this amount. (Doc. 42-13; Doc. 46, ¶¶ 46–47). ABFPC paid, under protest, $47,899.91, and likewise filed a Form 843 for this amount. (Doc. 46, ¶¶ 48–49). On September 23, 2019, Plaintiffs initiated this action, seeking refunds of the above sums. (*Id.* ¶ 50).

## II.   STANDARD OF REVIEW

To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam)). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## III.   DISCUSSION

Notably, the parties stipulated that Plaintiffs' qualifications for the alternative fuel excise tax credit is not a basis of recovery in this case. (Doc. 30). Rather, the limited issue presented in this case is whether the IRS may assess and collect refunds of alternative fuel excise tax credits erroneously paid to Plaintiffs after it mistakenly issued AL activity letter registrations to them.

However, the parties disagree as to the applicable law. Plaintiffs rely on *Lansons, Inc. v. Comm'r of Internal Revenue*, 622 F.2d 774 (5th Cir. 1980),[4] wherein the Fifth Circuit, applying the doctrine of equitable estoppel, held that the IRS abused its discretion by retroactively revoking a determination letter approving the taxpayer's profit-sharing trust as a qualified trust. *Id.* at 775–78. The IRS counters that *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990) controls. In that case, a government agent incorrectly informed an employed retiree approved for disability payments of the statutory rules for restoration of earning capacity, resulting in the loss of the retiree's benefits for six months. *Id.* at 416–18. The Supreme Court concluded that the retiree could not obtain reimbursement of these benefits under the Appropriations Clause, reasoning that Congress appropriated money for disability payments upon the satisfaction of statutorily enumerated conditions and that, having failed to qualify for this program, the retiree was simply ineligible for such payments. *Id.* at 424–34. In doing so, the

---

[4]   The Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981).

*Richmond* court rejected the use of equitable estoppel where monetary relief and statutory requirements are at stake. *Id.*

Specifically, Plaintiffs argue that *Lansons* governs the instant case for three reasons: (1) protest payments do not implicate the Appropriations Clause; (2) the instant case involves sanctioned agency determinations rather than informal advice from a low-level agency employee; and (3) reliance on *Richmond* "would viciously upend the United States' tax administration system." (Docs. 45, 47, 53). The IRS argues that *Richmond* controls here because: (1) there is no equitable right to payment of tax credits under the Appropriations Clause; (2) an AL activity letter registration is not an "agency determination" but rather "a prerequisite to file a claim"; and (3) reliance on *Lansons* would render portions of the Tax Code meaningless. (Docs. 42, 48, 54).

The Court addresses the parties' arguments in turn.

### A.    The Appropriations Clause

The Appropriations Clause provides, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Richmond*, 496 U.S. at 424.

Here, like *Richmond*, Congress appropriated alternative fuel excise credits upon the satisfaction of 26 U.S.C. § 6426(d) or § 6427(e)'s enumerated conditions. *See id.* at 424–34. And here, like *Richmond*, Plaintiffs failed to qualify for either credit. *See* 496 U.S. at 424–34; (Doc. 30). Although the Supreme Court refused to

accept "an across-the-board no-estoppel rule," it found that the "judicial use of the equitable doctrine of estoppel cannot grant respondent a money remedy that Congress has not authorized." *Id.* at 426–27. Accordingly, the Court cannot grant Plaintiffs refunds of alternative fuel excise tax credits that Congress has not authorized.

Plaintiffs argue that the return of their protest payments would not constitute an unauthorized appropriation. (Doc. 47, p. 7). But Plaintiffs only received this money in the first place because of the IRS's fumble. The term "authorization" refers only to Congress' sanction of the use of Treasury funds, as specified by the statutes in question. *See id.* at 424–34. The IRS's decision to distribute or withhold money is invalid if it conflicts with Congress' statutory approbation, even if that decision issues from the top ranks of the agency. *See id.*

Superficially, a *tax credit* may seem different from a *Treasury payment*: the former is the *subtraction* of a certain amount from the total taxes owed, whereas the latter is the *addition* of a certain amount to the net income. Substantively, however, this is a difference without distinction. In both instances, an individual who meets the requirements of a statute deprives the Treasury of funds to some extent.

This is particularly true where a tax refund is at issue—that is, a "payment of money from the Treasury." Here, not only did the IRS mistakenly find Plaintiffs eligible for the tax credit, but the IRS also admittedly compounded its initial error by *paying* Plaintiffs' Form 8894 claims from the Treasury.

Relatedly, Plaintiffs argue that the Court should construe the Appropriations Clause as applying only to "programmatic appropriations," such as the disability program at issue in *Richmond*, rather than the individualized tax assessments performed by the IRS. (*Id.*). But the disability program at issue in *Richmond* required the agency to examine whether a retiree's current income for any calendar year equals at least 80 percent of the current rate of pay of the position occupied immediately before retirement—in other words, the agency performed an individualized assessment of the retiree's restoration to earning capacity. *Id.* at 417. Most, if not all, programs involve similarly individualized inquiries, and, consequently, the Court does not see this as a basis for distinction. Furthermore, there is no indication in *Richmond* that its Appropriations Clause analysis is to be limited to "programmatic appropriations," especially given its broad discussion of the importance of the Clause in maintaining our federal system, and Plaintiffs do not offer any support for such a reading. And while Congress may not explicitly set aside a certain portion of Treasury funds for refunds in the same way it allocates money for programs, consideration of the tax laws—including refundable credits— is nonetheless a crucial part of its budgetary decisions.

Thus, the Court finds that this case implicates the Appropriations Clause.

### B.   Official Agency Acts v. Informal Advice

Plaintiffs assert that, unlike *Richmond*, the IRS cannot retroactively revoke the registrations at issue here, which constitute "official determination[s] with the imprimatur of the IRS" instead of unofficial recommendations from a low-level

government worker. (Doc. 45, pp. 31–36; Doc. 47, pp. 7–8; Doc. 53, pp. 9–10). In support of this contention, Plaintiffs cite to Treas. Regs. § 48.4101-1 and § 601.201.

Plaintiffs highlight that § 48.4101-1(f)(2) and § 48.4101-1(i) use the word "determines." (Doc. 45, pp. 31–32). But "determines" does not mean "determination letter" simply because they share a morpheme. That is, the IRS's determinations of certain facts bearing on an applicant's eligibility for registration does not equate to the issuance of a determination letter. Section 48.4101-1 applies to registrations and has nothing to do with, and does not even mention, determination letters.

Indeed, the procedure for registration is entirely different from the procedure to obtain a determination letter. To register for the AL activity letter, a taxpayer must simply submit the general information requested by a Form 637 to the Excise Operations Unit in Ohio. *See* § 48.4101-1(e); (Doc. 45-11). Registration is possible not only for those currently engaged in the AL activity but also for those "likely to be" so engaged. § 48.4101-1(f)(2). By contrast, to request a determination letter, a taxpayer must provide detailed information on a completed transaction and a $275 payment to the Chief of Excise Tax Operations in New Hampshire. Rev. Proc. 2013-1, 2013-1 I.R.B. 18–25, 53, 67, 82 §§ 7.01, 12.04, Apps. A, D.

Section 601.201 defines "determination letter" as "a written statement issued by a district director in response to *a written inquiry* by an individual or an organization that applies to the particular facts involved, the principles and precedents previously announced by the National Office." § 601.201(a)(3)

(emphasis added). The regulation further states that "It is the practice of the [IRS] to *answer inquiries* of individuals and organizations, whenever appropriate in the interest of sound tax administration, as to their status for tax purposes and as to the tax effects of their acts or transactions." § 601.201(a)(1) (emphasis added). In the specific context of excise taxes, District Directors can "issue determination letters in response to written requests from taxpayers who have filed or who are required to file returns over which they have audit jurisdiction, but only if the answers to *the questions presented* are specifically covered by statute, Treasury Decision or regulation, or a ruling, opinion, or court decision published in the Internal Revenue Bulletin." § 601.201(c)(3) (emphasis added).

Plaintiffs' registrations are not "determination letters" under § 601.201. Plaintiffs did not submit *a written inquiry* to the District Director as to their registration statuses. Rather, they submitted *an application* for registration. Plaintiffs did not ask a *question*—they made a *solicitation*. There is a contrast between a request for approval and a request for an answer to a question, between a request for registration and a request for a determination letter. *See* § 601.201(a). For this reason, Plaintiffs' emphasis on § 601.201(l)(5)—which prohibits the retroactive revocation of determination letters except in the event of certain "rare or unusual circumstances"—is unavailing.[5]

---

[5] Section 601.201(l)(5) actually applies to "rulings," but the same standard for retroactive revocation applies to determination letters through § 601.201(m). Notably, "rulings" are "written statement[s] issued to a taxpayer or his authorized representative by the National Office which interprets and applies the tax laws to a specific set of facts." § 601.201(a)(2), (b). Like determination letters, the IRS issues rulings in response to taxpayer inquiries. §

Plaintiffs' inability to surmount these definitional barriers render § 601.201 immaterial, but it is worth noting that there is another problem with Plaintiffs' reliance on § 601.201(l)(5): the IRS did not retroactively revoke their registrations. The IRS notified Plaintiffs of its decision to revoke their registrations on January 25, 2018, effective immediately—thus, revocation occurred simultaneously with notification and only applied prospectively. *See* § 48.4101-1(i)(3) (mandating that revocation of registrations occur at the same time as or after notification); (Docs. 42-10, 42-11). The notification letters made no attempt to reach back to 2015 or 2016, and, therefore, the letters did not affect the validity of Plaintiffs' prior registrations.

Plaintiffs' situation therefore differs from the circumstances at issue in *Lansons*. The Fifth Circuit appropriately applied § 601.201(l)(5) because the taxpayer requested, and the IRS issued, a determination letter as to the status of his profit-sharing trust under 26 U.S.C. § 401(a). *See* 622 F.2d at 775–79. The IRS then retroactively revoked the determination letter for the taxpayer's failure to satisfy § 401(a)'s requirements and demanded reimbursement of certain income tax deductions. *Id.* at 775–76. Here, the IRS neither issued determination letters nor retroactively revoked Plaintiffs' registration letters.[6]

---

601.201(a)(1). Although Plaintiffs do not assert that their registration letters constitute rulings, such an assertion would be incorrect for the same reason stated above.

[6] Plaintiffs cite to other equitable estoppel cases, but all of them are unpersuasive. None of these cases pertain to registrations for the alternative fuel excise tax credit, and none of them support the application of the equitable estoppel doctrine under these circumstances. *See United States v. Beane*, 841 F.3d 1273, 1286–87 (11th Cir. 2016) (concluding that a settlement

The real "retroactive revocation" that Plaintiffs contest here is the IRS's assessment of the erroneously paid refunds. (*See* Doc. 45, p. 32; Doc. 53, p. 9). Under 26 U.S.C. § 6206, which Plaintiffs do not discuss, the IRS may assess and collect any portion of a payment made pursuant to § 6427 that is "excessive" as if the claimant was liable for the alternative fuel excise tax. Section 6675(b) defines "excessive" as the amount by which the claim exceeds the amount allowable. Here, Plaintiffs do not argue, for the purposes of this proceeding, that they qualify for the claimed credits under § 6427(e) (or § 6426(d), which does not permit refunds). (Doc. 30). Therefore, the IRS can assess and collect their refunds as "excessive."

This reading is consistent with Treas. Reg. § 48.4101-1(i), which states that revocation of a registration cannot apply retroactively (*i.e.*, before the date of notice). This fact has no bearing on the IRS's ability to assess and collect excessive payments under 26 U.S.C. § 6202. Registration is one of the requirements to claim the alternative fuel tax credit—it is not dispositive, alone, of a claimant's

---

agreement between the IRS and a taxpayer did not equitably estop the IRS from using any amount of the tax deficiency other than the amount used in negotiating the agreement); *Lua v. United States*, 843 F.3d 950, 956 (Fed. Cir. 2016) (ruling that equitable estoppel did not prevent application of the statute governing deposits with the IRS by taxpayers); *Bokum v. Comm'r of Internal Revenue*, 992 F.2d 1136, 1141–42 (11th Cir. 1993) (finding that equitable estoppel did not prevent the IRS from seeking to recover additional income taxes for the 1971 tax year); *Boggs v. Comm'r of Internal Revenue*, 784 F.2d 1166, 1167 (4th Cir. 1986) (concluding that the Commissioner could not retroactively revoke its ruling that the taxpayer's profit-sharing trust was a qualifying trust under 26 U.S.C. § 401(a)); *Lesavoy Found. v. Comm'r of Internal Revenue*, 238 F.2d 589, 591 (3d Cir. 1956) (finding that the Commissioner exceeded his authority by retroactively revoking an individualized ruling).

Plaintiffs also cite a private letter ruling regarding an excise tax on sales of trucks. (Doc. 45, pp. 3–4); *see* I.R.S. P.L.R. 200043038 (Oct. 27, 2000). Private letter rulings cannot be used as precedent under 26 U.S.C. § 6110(k)(3), and, as explained previously, the registrations at issue are not "rulings."

entitlement to the credit.[7] In other words, a valid registration does not shield a claimant from an assessment, and although the IRS cannot retroactively *revoke* a registration, it can *collect* overpaid sums from claimants to correct the injury done to the Treasury. Any other interpretation gives the regulation precedence over the statute, which is clearly impermissible. The IRS does not have the power to supplant Congress' statutory mandate. *See Romano-Murphy v. Comm'r of Internal Revenue*, 816 F.3d 707, 717 (11th Cir. 2016) (stating that courts defer to Treasury regulations unless they are arbitrary, capricious, or manifestly contrary to the statute).

Moreover, this analysis is a logical one. For instance, perhaps a claimant's registration is valid, but she miscalculated her claim. In such circumstances, § 6206 gives the IRS the ability to assess and collect the overpaid amount, but the assessment does not impact her registration status. Where, as here, the IRS also

---

[7] Plaintiffs' reply asserts that "registrations are not simply one requirement under the statute" because they "stipulate that the activities for which the registrations are issued meet the statutory language that pertain to the relevant activity letters and corresponding tax provisions." (Doc. 53, p. 10). Registration is certainly an important element of a claim for the alternative fuel excise tax credit, but the point here is that there is no evidence that it is the sole element of such a claim, and Plaintiffs do not seem to argue as such.

To the extent that Plaintiffs' reply implies that registration is the only requirement of this claim, the Court notes that Plaintiffs' Motion acknowledges that registration is a form of "pre-approval" for the credit that does not prevent the IRS from auditing taxpayers "to evaluate whether transactions or facts diverge from the premise under which a registration is issued." (Doc. 45, p. 7, ¶ 8; Doc. 53, p. 10). Thus, Plaintiffs thereby recognize that the process for claiming the alternative fuel excise tax credit involves two steps: (1) the IRS's approval of an applicant's Form 637, resulting in the applicant's registration; and (2) the IRS's approval of the registrant's claim for credit, which may involve an audit and an assessment of excessive claims. *See* 26 U.S.C. §§ 4101, 6426(a), 6427; Treas. Reg. § 48.4101-1; (Doc. 45-2, pp. 15–16, 50:1–6, 53: 2–58:6) (explaining that the IRS conducts follow-up compliance reviews to verify a registrant's qualification for the credit and audits claims received for the credit, which constitute separate procedures).

determines that the claimant does not qualify for registration, it can revoke her registration upon or after proper notification. Treas. Reg. § 48.4101(i) and 26 U.S.C § 6206 are disparate administrative actions that operate in distinct sections of the Tax Code: the former ensures that the IRS cannot retroactively revoke the *registration* demanded by the alternative fuel excise tax; the latter permits the assessment and collection of excessive alternative fuel excise tax credit *refunds*.

In sum, a "registration letter" is not equivalent to a "determination letter," and the IRS did not retroactively revoke Plaintiffs' registration letters.

### C.    Policy Considerations

Plaintiffs also assert that application of *Richmond* to the instant case would "render a litany of statutes and regulations invalid" and "upset settled expectations." (Doc. 47, pp. 8–9). Plaintiffs cite to Treas. Reg. § 601.201(l)(5), but, as stated in detail above, that regulation does not apply to this case.[8]

In fact, *failure* to apply *Richmond* here would render 26 U.S.C. § 6206, § 6426, and § 6427 invalid by prioritizing registrations issued under Treas. Reg. §

---

[8] Plaintiffs also reference Advanced Pricing Agreements, which is "a voluntary process whereby the [IRS] and taxpayers may resolve transfer pricing issues under § 482 of the Internal Revenue Code [], the Income Tax regulations [] thereunder, and relevant income tax treaties to which the United States is a party in a principled and cooperative manner on a prospective basis." Rev. Proc. 2006-9, 2006-2 I.R.B. 3, § 1.01. The Court fails to see how this program—which implicates a different part of the Tax Code as well as different regulations—relates to the alternative fuel excise taxes at issue here. Moreover, the case cited by Plaintiffs is distinguishable. *Eaton Corp. v. Comm'r of Internal Revenue*, 140 T.C. 410 (2013). *Eaton* involved the IRS's cancellations of two Advanced Pricing Agreements, which the Tax Court refers to as "administrative determinations" or "rulings." *Id.* at 414–18. The Tax Court held that the IRS and the taxpayer were bound to the terms agreed upon in the Advanced Pricing Agreements. Thus, pursuant to those terms, the IRS had discretion to cancel the Advanced Pricing Agreements under certain circumstances. *Id.* at 418–19. *Eaton* does not discuss the Appropriations Clause, and cancellations of Advanced Pricing Agreements seem to be "rulings" subject to § 601.201, unlike the instant case.

48.4101-1 at the expense of the statutory requirements. Registrations would become "a license to receive payment of credits." (Doc. 54, p. 5).

While Plaintiffs' frustration is understandable, *Richmond* unequivocally addressed and prohibited the application of the equitable estoppel doctrine to these circumstances. It noted that, "where public money is at stake," a no-estoppel rule is necessary "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." 496 U.S. at 427–28. The Supreme Court illustrated the danger of ruling otherwise:

> Extended to its logical conclusion, operation of estoppel against the Government in the context of payment of money from the Treasury could in fact render the Appropriations Clause a nullity. If agents of the Executive were able, by their unauthorized oral or written statements to citizens, to obligate the Treasury for the payment of funds, the control over public funds that the Clause reposes in Congress in effect could be transferred to the Executive. If, for example, the President or Executive Branch officials were displeased with a new restriction on benefits imposed by Congress to ease burdens on the fisc . . . and sought to evade them, agency officials could advise citizens that the restrictions were inapplicable. Estoppel would give this advice the practical force of law, in violation of the Constitution.
>
> It may be argued that a rule against estoppel could have the opposite result, that the Executive might frustrate congressional intent to appropriate benefits by instructing its agents to give claimants erroneous advice that would deprive them of the benefits. But Congress may always exercise its power to expand recoveries for

> those who rely on mistaken advice should it choose to do
> so.

*Id.* at 428. In balancing equitable considerations and federalism interests, the latter outweighs the former.

Plaintiffs propose that this case differs from *Richmond* because it involves "official agency determinations" rather than "the every-day assistance that lower-level government workers provide to individuals." (Doc. 47, p. 8). They also contend that the statutes at issue are unclear, as evidenced by "the fact that multiple experienced IRS professionals and managers, on multiple occasions, determined that Plaintiffs qualified for the alternative fuel tax credit." (*Id.* at p. 8, n.3.

First, as explained above, Plaintiffs' registrations did not constitute "determination letters." It is questionable whether top-tier agency officials issued these registrations, but, even so, the portion of *Richmond* cited by Plaintiffs does not limit its ruling to "lower-level" agents. Rather, the Supreme Court refers to government agents generally, without regard to their "level." *Id.* at 433–34. Regardless of the agent's position in the IRS hierarchy, the IRS cannot waive statutory requirements—and thereby essentially amend a statute—under the Appropriations Clause. Ordering the return of this money contravenes Congress' alternative fuel excise tax credit plan to the detriment of the public. It is unfair for other taxpayers to essentially fund a windfall for Plaintiffs.

Additionally, the "natural consequence" of a rule of estoppel that makes the IRS liable for incorrect registrations issued by its agents would be a decision to "cut back and impose strict controls upon" the issuance of registration letters to reduce liability, contrary to Plaintiffs' assertion. *Id.* at 433. The registration process would become much more burdensome and would take much longer, making it harder for taxpayers to acquire the alternative fuel tax credit. *See id.*

Second, Plaintiffs do not cite any authority for the proposition that *Richmond* only applies to "clear" statutes, and the Court does not see any support for this position in *Richmond* itself. *Richmond* establishes that the Appropriations Clause prohibits a claim for payment of money from the Treasury that is contrary to a statutory appropriation. *Id.* at 426. This is true regardless of a statute's complexity.

In conclusion, the Court finds that *Richmond*'s policy justifications apply here with the same force. Because Plaintiffs do not dispute their qualifications for the alternative fuel excise tax credit in this action, and because the IRS did not act improperly in assessing and collecting the erroneously paid refunds under the Appropriations Clause and the Tax Code, the Court concludes that Plaintiffs are not entitled to reimbursement of their protest payments.[9]

---

[9]  Given the Court's findings, it does not need to address the IRS's argument that Plaintiffs lack detrimental reliance. (Doc. 42, pp. 9–12). There is also no need for the Court to consider the IRS's variance doctrine argument, raised for the first time in its Response in Opposition to Plaintiffs' Motion. (Doc. 48, pp. 18–19). However, the Court notes that Plaintiffs' claim for refund identifies the "essential requirements" of the demand: the IRS determined that Plaintiffs qualified for the alternative fuel tax credit and registered them accordingly; Plaintiffs received refunds; the IRS audited Plaintiffs' claims for refunds and concluded that the credits had been paid in error, unlike previous audits; and the IRS revoked Plaintiffs' registrations

## IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED** and **ADJUDGED** as follows:

1.      Plaintiffs' Motion for Summary Judgment (Doc. 45) is **DENIED**; and

2.      Defendant's Motion for Summary Judgment (Doc. 42) is **GRANTED**.

**DONE AND ORDERED** in Orlando, Florida on March 29, 2021.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

and sought repayment of the refunds. (Doc. 42-48); *see Charter Co. v. United States*, 971 F.2d 1576, 1579–80 (11th Cir. 1992) ("Although crystal clarity and exact precision are not demanded, at a minimum the taxpayer must identify in its refund claim the 'essential elements' of each and every refund demand."). Plaintiff ABFPC states that it "detrimentally relied on the Service's determinations and representations, and thus the Service should be estopped from clawing-back alternative fuel credits previously paid," and Plaintiff ABF refers to the IRS's "changed mind about ABF's qualification for the alternative fuel credits." (*Id.* at pp. 8, 18). It is clear that Plaintiffs desired to pursue an equitable estoppel theory of recovery, even if their refund claims do not use the word "retroactive."